IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

CYNTHIA COLLINS,

    Plaintiff,

vs.                      Case No. 4:07cv548-MP/WCS

MICHAEL J. ASTRUE,[1]
**Commissioner of Social Security,**

    Defendant.

_____/

## REPORT AND RECOMMENDATION

This is a social security case referred to me for a report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D. Loc. R. 72.2(D). It is recommended that the decision of the Commissioner be affirmed.

**Procedural status of the case**

Plaintiff, Cynthia Collins, applied for supplemental security income benefits. Plaintiff was 49 years old at the time of the administrative decision, has a 10th grade

---

[1] Michael J. Astrue became Commissioner of Social Security on February 12, 2007, and is automatically substituted as Defendant. Fed. R. Civ. P. 25(d).

education (although that is questionable), and has past relevant work as a housekeeper, laundry worker, and fast food cook.  R. 15.  Plaintiff alleges disability due to systemic lupus erythematosus, asthma, and depression.  *Id.*  The Administrative Law Judge found that Plaintiff has the residual functional capacity to do a limited range of sedentary work and can no longer do her past relevant work.  R. 19-20.  Based upon those limitations, a vocational expert determined that Plaintiff could do the following jobs:  cutter and paster of press clippings, ink printer, and tube operator.  R. 20.  The ALJ thus found that Plaintiff was not disabled as defined by Social Security law.  R. 21.

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.  Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if supported by substantial evidence."  Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002).  "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."  Phillips v. Barnhart, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (citations omitted).  The court must give "substantial deference to the Commissioner's decision."  Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005).  "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which

support the ALJ. A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.' " Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A). A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). Both the "impairment" and the "inability" must be expected to last not less than 12 months. Barnhart v. Walton, 535 U.S. 212, 122 S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

The Commissioner analyzes a claim in five steps. 20 C.F.R. § 404.1520(a)-(f):

1. Is the individual currently engaged in substantial gainful activity?

2. Does the individual have any severe impairments?

3. Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404?

  4. Does the individual have any impairments which prevent past relevant work?

  5. Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits. A positive finding at step three results in approval of the application for benefits. At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work. If the claimant carries this burden, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy. Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Evidence from the Administrative Hearing**

  Plaintiff suffered severe burns when she was four years old, and she is substantially lacking in education as a result. R. 280. She testified that she cannot spell or read. *Id.* She thought she had gone to school through about the 10th grade, but said that she did not learn anything. R. 281.

  Plaintiff said that her primary problems are her back and legs. R. 279. She has third degree burn scars on her leg and said "it swells and it's painful." R. 279-280. Her feet also swell very badly. R. 280.

  Plaintiff testified that on an average day, she washes and eats breakfast if she is "not sickly," but most of the time she said that she cannot eat due to an upset stomach.

R. 270.  She testified that she stays in bed "some days."  *Id*.  Plaintiff said that she cannot get out of bed because when she moves, she is "in so much pain."  R. 271.

Plaintiff said that her husband fixes her meals and does all of the household chores.  R. 270-271.  Her husband also helps her in the shower.  R. 278.  She has never had a driver's license and does not drive.  R. 272.

Plaintiff said that she is unable to read and she listens to audio recordings.  R. 271.  She attends church twice a month.  R. 278.

Plaintiff testified that due to back and leg pain, she cannot sit more than 10 minutes in an 8 hour day, and then has to walk around and lie down.  R. 272.  She carries a pillow for sitting and cannot sit in hard chairs.  R. 291.

Plaintiff said she thought she could stand only 10 to 15 minutes in an 8 hour day.  R. 273.  She said that walking "from here to the car" caused her to be "out of breath."  *Id*.  She has asthma and would be "wheezing" from walking short distances.  *Id*.  She uses an inhaler twice a day for her asthma.  R. 276.  Plaintiff said she could not perform the physical requirements of parking lot attendant because she cannot sit and stand for very long.  R. 284-285.  Plaintiff uses a cane (with a grabber device on the end) for walking.  R. 289-290.

The ALJ called a vocational expert as a witness.  The hypothetical that the ALJ presumably presented to the vocational expert (containing the ALJ's determination of Plaintiff's residual functional capacity) is not in the transcript.  R. 292-293.  The vocational identified three jobs that presumably Plaintiff would still be able to do, that is, a cutter and paster of "grass" [sic, press] clippings, ink printer machine tender, and tube operator.  R. 293.

**Medical Evidence**[2]

On October 10, 2001, Plaintiff was seen by Dung Nguyen, M.D. R. 141. Dr. Nguyen noted that Plaintiff's ANA[3] level was positive. *Id.* Dr. Nguyen noted that it was possible that Plaintiff had SLE (lupus).[4] *Id.* on October 31, 2001, Plaintiff was seen by Dr. Nguyen. R. 140. He noted that this was a "follow-up of systemic lupus erythematosus." It was noted that Plaintiff had an appointment with Dr. Szczesny on December 3, 2001. *Id.*

---

[2] Descriptions of the purpose and effects of prescribed drugs are from PDRhealth™, PHYSICIANS DESKTOP REFERENCE, found at: http://www.pdrhealth.com/drugs/drugs-index.aspx, or PHYSICIANS' DESK REFERENCE, as available to the court on Westlaw. Information about medical terms and prescription drugs come from DORLAND'S MEDICAL DICTIONARY FOR HEALTH CONSUMERS, available at: http://www.mercksource.com (Medical Dictionary link).

[3] ANA are antinuclear antibodies directed against components of the cell nucleus, such as DNA, RNA, and histones; they may be detected by immunofluorescence. A positive ANA test is characteristic of systemic lupus erythematosus, DORLAND'S MEDICAL DICTIONARY FOR HEALTH CONSUMERS.

[4] Systemic lupus erythematosus (SLE) is a chronic inflammatory disease, usually febrile, with damage to the skin, joints, kidneys, nervous system, mucous membranes, and less often other organs; it usually has periods of remissions and exacerbations. It is primarily a disease of women, occurring five to ten times more often in females than in males. Although the peak incidence is between 30 and 40 years of age, the condition has also been diagnosed in the very young and the very old. SLE is the classic prototype of an autoimmune disease of connective tissue. Its cause is unknown, but the high level of autoantibodies in affected persons indicates a defect in the regulatory mechanisms that sustain self-tolerance and prevent the body from attacking its own cells, cell constituents, and proteins. Clinical manifestations are diverse, because this type of lupus affects connective tissue throughout the body. Typically, the patient seeks medical help for relief of fever, weight loss, joint pain, the characteristic butterfly rash, pleural effusion and pleuritic pain, and nephritis. Either mild glomerulonephritis or heart problems such as myocarditis, endocarditis, or pericarditis, are found in about half the patients with SLE. Pulmonary disease, gastrointestinal disturbances, and lymph node involvement are also common. DORLAND'S MEDICAL DICTIONARY FOR HEALTH CONSUMERS.

On December 3, 2001, Plaintiff was examined by John M. Szczesny, M.D.  R. 127.  Dr. Szczesny said that Plaintiff had extensive scarring from third degree burns sustained when she was age four.  *Id.*  Plaintiff believed that the pain she experiences is related to her burn injuries, and said that the problems "just seem to get worse."  *Id.*  Plaintiff had had a positive ANA and had been sent to him for further evaluation concerning possible systemic lupus erythematosus.  *Id.*  Plaintiff was then working full time in two cleaning jobs.  *Id.*  Plaintiff reported that she drank beer and "has been trying to cut down from her typical 12 cans per day."  *Id.*  She had no hair loss, sun sensitivity, or Raynaud's symptoms.[5]  *Id.*  Plaintiff was found to be in no acute distress.  *Id.*  Dr. Szczesny found no acute joint inflammation, but he found that Plaintiff had "2+ soft tissue tenderness both above and below the waist."  *Id.*  He found that Plaintiff had "significant dark circles under both eyes."  R. 128.  She had full strength (5/5) in her hip flexor, deltoid, and biceps.  *Id.*  Dr. Szczesny noted "ANA slightly elevated in a ratio of 1:40 nucleolar pattern."  *Id.*  Dr. Szczesny's impression was:

> Musculoskeletal pain, fatigue, positive ANA and soft tissue tenderness.  SLE versus fibromyalgia or perhaps a combination of those two problems.  Will further investigate with some additional lab work including ANA profile with the Smith, RNP, anti-DNA and Sjogren's antibodies, as well as urinalysis.  She is given a brief article about fibromyalgia to read.  I believe this is influencing her symptoms to some extent.

*Id.*  Dr. Szczesny wanted Plaintiff to return in two or three weeks to review the results to the testing that day.  *Id.*  There is no evidence that she then returned to Dr. Szczesny.

---

[5] Raynaud's phenomenon is a condition in which cold temperatures or strong emotions cause blood vessel spasms that block blood flow to the fingers, toes, ears, and nose.  DORLAND'S MEDICAL DICTIONARY FOR HEALTH CONSUMERS.

On November 8, 2002, Kirk J. Mauro, M.D., examined Plaintiff on a consultative basis. R. 154. Dr. Mauro said that Plaintiff had a history of asthma, lupus, hypertension, and depression. *Id.* Plaintiff said that she had difficulty with chemicals and perfumes due to her asthma. *Id.* Dr. Mauro said that Plaintiff was then taking Advair,[6] Zocor,[7] Lotrel,[8] Zoloft,[9] Flonase,[10] Clarinex, and Myocardis. *Id.* Dr. Mauro observed that Plaintiff had been extensively burned when she was age 3, and had diffuse scar formation over her left lower extremity, abdomen, back and chest. *Id.* She told him that she quit work in 2001 due to "flare-ups of lupus." *Id.* Plaintiff told Dr. Mauro that she lives with her husband, is able to do cooking and cleaning, but does not do laundry. *Id.* She reported that she was independent with her feeding, grooming, dressing, and bathing. *Id.* She denied any hand dysfunction, and could do buttons, zippers, snaps, and tie her shoes. *Id.* She said a typical day was spent sitting and watching television. *Id.* Dr. Mauro said that Plaintiff had minimal ability to read or write. R. 155. On examination, Dr. Mauro made the following findings:

---

[6] Advair Diskus is used to treat asthma. PHYSICIANS' DESK REFERENCE (2005).

[7] Zocor is a cholesterol-lowering drug. PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

[8] Lotrel is used in the treatment of high blood pressure. PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

[9] Zoloft is prescribed for major depression – a persistently low mood that interferes with everyday living. PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

[10] Flonase, which is a brand name for fluticasone, is a nasal spray is a remedy for the stuffy, runny, itchy nose that plagues many allergy-sufferers. It can be used either for seasonal attacks of hay fever or for year-round allergic conditions. Flonase is a steroid medication. It works by relieving inflammation within the nasal passages. PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

> The motor examination is 4/5 in the upper and lower extremities and symmetrical. The sensory examination appears intact. There is no other peripheral nerve or dermatomal deficit. This is difficult to assess because of the scar formation and hyposensitivity with scar formation. The reflexes were 1/4 in the upper extremities, 1/4 in the patellar and Achilles'. She has negative straight leg raise at 90 degrees. She is able to stand on her heels and toes. She is able to squat. She could walk forward, backward and tandem walk. There is diffuse scarring over the back but no obvious spasm is noted. There is increase in lumbar lordosis, due to her abdominal girth. There is SI joint tenderness. She has intact finger dexterity. The right hand grip was 64 pounds, and the left hand grip was 40 pounds. The cranial nerves are within normal limits. There is no obvious facial asymmetry, other than the right jaw swelling, as mentioned. She is awake, alert and able to follow all instructions. The joints have no pain, swelling, redness or signs of abnormality or inflammation.

R. 155. Dr. Mauro said that Plaintiff had had no complications from her hypertension. *Id.* He concluded: "Overall, objectively, the patient appears to be quite functional, based upon her subjective and objective findings today." *Id.*

On March 11, 2003, Plaintiff was seen by Leonard Leichus, M.D., on a consultative basis for intermittent hematemesis[11] for the past year. R. 196. Dr. Leichus said that Plaintiff "is admittedly an alcoholic but states that she has cut down to a six-pack a day." *Id.* She was taking "at least six BC Powders per day due to the abdominal pain." *Id.* A past history of lupus, hypertension, asthma, depression, chronic back pain, anemia, and severe burns was noted. *Id.* Dr. Leichus found that Plaintiff was "ambulatory to clinic in no distress." *Id.* On examination, he found no "CVA tenderness." R. 197. He also observed "1+ pitting edema of the lower legs, ankles, and

---

[11] Hematemesis is the vomiting of blood. DORLAND'S MEDICAL DICTIONARY FOR HEALTH CONSUMERS.

feet." *Id.* Dr. Leichus's impression was that Plaintiff had "upper abdominal pain, hematemsis, melena,[12] anemia, and alcoholism." *Id.*

On September 19, 2003, Plaintiff was seen by Dr. Nguyen. R. 250. She complained of chronic lumbar back pain, left leg pain, and left shoulder pain. *Id.* Straight leg raise test was negative bilaterally, she had normal range of motion with no significant tenderness or spasm, and her strength was 5/5 in the lower extremities. *Id.* Her mood was slightly depressed. *Id.* On October 1, 2003, Plaintiff had an MRI of her lumbar spine. R. 249. The impression was that there was no evidence of lumbar spinal stenosis, minimal inferior foraminal narrowing on each side at L4-L5, and normal disc spaces and no compression fractures. *Id.* Dr. Nguyen reviewed this MRI on October 15, 2003, and found the results to be negative. R. 245.

On June 18, 2004, Plaintiff went to Dr. Nguyen with a complaint of right sided knee pain. R. 231. She had had no previous history of injury to that knee. *Id.* Dr. Nguyen noted possible SLE with a positive ANA. *Id.* A rheumatology referral was considered for possible lupus. *Id.*

On November 9, 2004, Plaintiff was again seen by Dr. Szczesny. R. 260. Plaintiff said she was always in pain, and was to be evaluated for possible lupus. *Id.* Dr. Szczesny noted that "[i]n the past, she has had a weakly positive test for lupus with a positive ANA of 1:40." *Id.* Dr. Szczesny said that Plaintiff had had "vague musculoskeletal pains, dry eyes and dry mouth, nasal ulcerations, low energy levels, fatigue, sleep problems and depression, but no hair loss, sun sensitivity, or Raynaud's."

---

[12] Melena is the darkening of the feces by blood pigments. DORLAND'S MEDICAL DICTIONARY FOR HEALTH CONSUMERS.

*Id.* Dr. Szczesny then said there was "vague sun sensitivity." *Id.* He said she complained of muscle and joint pain, but no swelling. *Id.* On examination, Dr. Szczesny found "1+ to 2+ soft tissue tenderness" above and below the waist. R. 260-261. Dr. Szczesny commented: "Interestingly, the patient has a distinct amount of soft tissue tenderness both[13] above the waist in a fibromyalgic pattern." R. 261. She had dark circles under her eyes. *Id.* There was no active synovitis[14] in the range of motions of hands, wrists, elbows, hips, knees, feet, and ankles. *Id.* He said that Plaintiff's edema and acute joint pain had subsided. *Id.* Her upper and lower extremity range of motion was within normal limits. *Id.* Dr. Szczesny's impression was that Plaintiff "has hypertension, depression, chronic pain, asthma and possible collagen vascular disease such as lupus." *Id.* Dr. Szczesny was uncertain whether Plaintiff had a connective tissue disease. *Id.* He said: "Certainly, in the past she has run a positive ANA and rheumatoid factor, but clinically, her aches and pains seem to be coming more from stress and aggravation as well as problems of degenerative and rheumatoid arthritis." *Id.* Dr. Szczesny did not want to recommend more treatment until he had a "better feel for what we are dealing with." *Id.*

Plaintiff returned to Dr. Szczesny on December 7, 2004. R. 259. Dr. Szczesny said that: "[i]n view of her symptoms that include chronic pain, sleep disturbance with non-restorative problems, low energy level and some memory, thinking and confusion

---

[13] The use of the word "both" implies that Dr. Szczesny meant to say both above and below the waist, as he did earlier.

[14] Synovitis is inflammation of a synovium; it is usually painful, particularly on motion, and is characterized by a fluctuating swelling due to effusion within a synovial sac. DORLAND'S MEDICAL DICTIONARY FOR HEALTH CONSUMERS.

problems, I think we are dealing with fibromyalgia." *Id.* He planned to start Plaintiff on "therapy for fibromyalgia" and prescribed Klonopin[15] and Effexor.[16] *Id.*

Plaintiff returned to Dr. Szczesny on February 28, 2005, and was seen by the nurse practitioner. R. 248. She reported that the higher dose of Effexor had helped her a little bit with sleep. *Id.* It was reported that she had "3+ soft tissue tenderness above and below the waist" and had dark circles under her eyes. *Id.*

**Legal Analysis**

Plaintiff argues that the ALJ failed to properly evaluate the medical evidence and discounted her diagnosis of fibromyalgia. Doc. 15, pp. 2-7. Plaintiff also argues that the ALJ did not properly evaluate her credibility. *Id.*, p. 7. Plaintiff asserts:

> More telling is the manner in which the medical professionals bias their reported diagnoses. In several instances, the ALJ is persuaded by medical opinions in which the physical conditions and diagnosis confirm Plaintiff's pain and soft tissue tenderness, but seek to explain it away by making observations beyond their professional competence.

*Id.*, p. 7. These several contentions will be collectively addressed here.[17]

---

[15] Klonopin is used to treat convulsive disorders such as epilepsy. It is also prescribed for panic disorder, that is, unexpected attacks of overwhelming panic accompanied by fear of recurrence. Klonopin belongs to a class of drugs known as benzodiazepines. PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

[16] Effexor is prescribed for the treatment of depression – that is, a continuing depression that interferes with daily functioning. Effexor is also prescribed to relieve abnormal anxiety (generalized anxiety disorder and social anxiety disorder), which may include sleep disturbance. PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

[17] My service order required that Plaintiff "cite the record by page number for every factual contention." Doc. 9, p. 2. Plaintiff did not comply, but did cite the exhibits without a page citation.

Case No. 4:07cv548-MP/WCS

The ALJ found at step 2 that Plaintiff has the severe impairment of lupus, not fibromyalgia. R. 21. This finding is supported by substantial evidence in the record. While the physicians who treated Plaintiff did not definitively determine that she has lupus, the medical notes discussed above more frequently and firmly give a diagnosis of lupus rather than fibromyalgia, and it was only at the end of the records that Dr. Szczesny said that he was beginning to suspect that Plaintiff has fibromyalgia. "Fibromyalgia is a rheumatic disease and the relevant specialist is a rheumatologist." Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir. 1996). The signs of fibromyalgia, according to American College of Rheumatology guidelines, are primarily tender points on the body. Green-Younger v. Barnhart, 335 F.3d 99, 107 (2nd Cir. 2003). The court there said: "Green-Younger exhibited the clinical signs and symptoms to support a fibromyalgia diagnosis under the American College of Rheumatology (ACR) guidelines, including primarily widespread pain in all four quadrants of the body and at least 11 of the 18 specified tender points on the body." *Id.* While the treating physicians repeatedly found that Plaintiff had tender points both above and below her waist, no physician definitively identified the requisite number of tender points and definitively determined that Plaintiff's ailments include fibromyalgia. Thus, the ALJ did not improperly discount a diagnosis of fibromyalgia.

Plaintiff also contends that the ALJ did not properly consider her credibility. Pain and other symptoms reasonably attributed to a medically determinable impairment are relevant evidence for determining residual functional capacity. Social Security Ruling 96-8p, p. 4. Pain and other symptoms may affect either exertional or non-exertional capacity, or both. *Id.*, p. 6.

> In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing:  *(1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.  See Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).  If the ALJ discredits subjective testimony, he must articulate explicit and adequate reasons for doing so.  *See Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987).  Failure to articulate the reasons for discrediting subjective testimony requires, as a matter of law, that the testimony be accepted as true.  *See Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002) (emphasis added).  The reasons articulated for disregarding the claimant's subjective pain testimony must be based upon substantial evidence.  Jones v. Department of Health and Human Services, 941 F.2d 1529, 1532 (11th Cir. 1991).  It is not necessary that the ALJ expressly identify this circuit's pain standard if his findings "leave no doubt as to the appropriate result" under the law.  Landry v. Heckler, 782 F.2d 1551, 1553-1554 (11th Cir. 1986).

The ALJ determined that Plaintiff's testimony was not entirely credible.  R. 18.  The ALJ found that the objective medical findings were not "so severe that they should prevent the performance of all work-related physical activity."  *Id.*

The ALJ first discounted the testimony concerning the debilitating effects of asthma, finding that "Dr. Mauro diagnosed the claimant with a history of asthma but mentioned no treatment for this," and found that the rest of the medical record was "silent for any further treatment for this condition."  *Id.*  This finding is supported by substantial evidence in the record.

The ALJ also discounted Plaintiff's testimony, pointing out that Dr. Szczesny determined that she was in no acute distress, had no acute inflammation, had full

muscle strength, and her ANA was only slightly elevated. R. 18. These findings are supported by substantial evidence in the record discussed above. The ALJ also noted that Dr. Mauro found that Plaintiff's motor strength was 4/5, her sensory examination was intact, her straight leg raise was negative, and she was able to perform normally with respect to standing on her heels and toes, squatting, walking forward, backward, and tandem walk. *Id.* His examination of Plaintiff's joints revealed no pain, swelling, redness, or signs of abnormality or inflammation, and he gave the opinion that "the claimant appeared to be quite functional, based upon his subjective and objective findings." *Id.* He noted that Dr. Leichus found Plaintiff to be ambulatory, in no distress, with no chronic arthritis tenderness. *Id.* These findings are supported by substantial evidence in the record as well.

Finally, the ALJ determined that Plaintiff's activities of daily living were inconsistent with the degree of disability described in her testimony. R. 19. The ALJ pointed out that Plaintiff told Dr. Mauro that she did significant self-care tasks, and was able to sit all day. *Id.* These findings are supported by substantial evidence in the record. Dr. Mauro reported that Plaintiff said that she was able to do cooking and cleaning, was independent with her feeding, grooming, dressing, and bathing, denied any hand dysfunction, and could do buttons, zippers, snaps, and tie her shoes. R. 154. She said a typical day was spent sitting and watching television. *Id.* The ALJ, therefore, gave sufficient reasons for not entirely crediting Plaintiff's testimony, and those reasons are supported by substantial evidence in the record.

**Conclusion**

In summary, it seems evident that Plaintiff has a serious illness, such as lupus or fibromyalgia.  But as noted in footnote 4 above, the range of impairments that might be flow from having lupus varies widely.  None of the treating physicians here said that Plaintiff cannot do limited kinds of sedentary work.  Considering the record as a whole, the findings of the Administrative Law Judge correctly followed the law and are based upon substantial evidence in the record.  The decision of the Commissioner should be affirmed.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits be **AFFIRMED**.

**IN CHAMBERS** at Tallahassee, Florida, on March 6, 2009.


s/    William C. Sherrill, Jr.
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


**NOTICE TO THE PARTIES**

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**